**NOT FOR PUBLICATION**                              [Docket No. 43 and 51]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

| | |
|---|---|
| TRANS WORLD TECHNOLOGIES, INC., <br><br> Plaintiff, <br><br> v. <br><br> RAYTHEON COMPANY and LOCKHEED MARTIN CORPORATION, <br><br> Defendants. | Civil No. 06-5012(RMB) <br><br><br> **OPINION** |

APPEARANCES:

Chad A. Rutkowski, Esquire
Woodcock Washburn, LLP
2929 Arch Street, 12th Floor
Philadelphia, Pennsylvania 19104
(215) 568-3100
    Attorney for Plaintiff

John B. Kearney, Esquire
Rosemary Bates Walsh, Esquire
Ballard, Spahr, Andrews & Ingersoll, LLP
Plaza 1000, Suite 500
Main Street
Voorhees, New Jersey 08043-4636
(856) 761-3482
    Attorneys for Defendant Raytheon Company

William J. Heller, Esquire
Scott S. Christie, Esquire
McCarter & English, LLP
Four Gateway Center
100 MULBERRY STREET
P.O. Box 652
Newark, New Jersey 07102-0652
(973) 622-4444
    Attorneys for Defendant Lockheed Martin Corporation

**BUMB**, United States District Judge:

**INTRODUCTION**

This matter comes before the Court upon the Defendants Raytheon Company's ("Raytheon") and Lockheed Martin Corporation's ("Lockheed") (collectively the "Defendants") joint motion to dismiss the following Counts of the Second Amended Complaint: Count XII (Misappropriation of Idea); Count XIV (Misappropriation of Confidential and Proprietary Information); Count XV (Promissory Estoppel); and Count XVI (Sherman Act, § 1). Plaintiff Transworld Technologies, Inc. ("TWT") has opposed the motion.  For the reasons set forth below, the Defendants' motion to dismiss will be granted in part and denied in part.

**FACTS**[1]

Plaintiff Transworld Technologies, Inc. ("TWT") is a small, high-technology company with expertise and experience in designing and developing sophisticated software, primarily for defense and naval engineering applications.  Over the past fifteen years, TWT has been predominantly a United States Navy defense contractor.  TWT developed a damage control automation system designed primarily for use on naval vessels.  TWT alleges that its unique approach to damage control results in a reduction

---

[1] Because this is a Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the facts as pled in TWT's Second Amended Complaint are taken as true.  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965 (2007).  For ease, the Second Amended Complaint is referred to as the Complaint.

of the magnitude of secondary damage caused by fire, flooding, stability problems, hull stress, nuclear warfare, biological warfare, and chemical warfare.  Compl. at ¶¶ 2, 12-16.

   The U.S. Navy is developing a major program called the DDG-1000. Id. at ¶¶ 3, 18.  The DDG-1000 program is aimed at developing new and revolutionary military ships.  Id. at ¶ 1. It is anticipated that the new technologies developed for and implemented during the DDG-1000 program will be used on a range of future ship classes.  Id. at ¶¶ 17-20.

   Part of the new technology being developed for the DDG-1000 program is Damage Decision Assessment ("Damage Assessment" or "DA") software.  This software is intended to assist ship personnel in dealing with fires, explosions, flood conditions, and other hazards facing naval vessels.  Id. at ¶¶ 3-4, 22.

   TWT worked on the development of the Damage Assessment component of the DDG-1000 program from October 1998 to September 2005, as a subcontractor, first, to Defendant Raytheon (in the first two phases of the project, "Phases I and II") and then, to Northrup Grumman Ship systems ("Northrup Grumman") (for the third phase of the project, "Phase III").  Id. at ¶ 20.

   Towards the end of Phase III, TWT was asked to begin sharing with fellow members of the DDG-1000 design team certain of its trade secrets, ideas, and confidential proprietary information. Id. at ¶¶ 31-34. TWT agreed, subject to certain express

acknowledgments that the sharing of this information was beyond the scope of its contract for Phase III, that all rights in the information remained with TWT, that TWT controlled use of the information, and that access to the information by others would be restricted.  Id.  TWT was not paid by Northrup Grumman for this preliminary information-sharing.  Id. at ¶ 34. TWT's information was placed on a secure computer system known as the Vault, or Team Center, designed specifically so that contractors could share sensitive proprietary information with each other without sacrificing the confidential nature of their information. Id. at ¶¶ 27-30.

In the spring and summer of 2005, the Navy announced that it was reorganizing the DDG-1000 program for Phase IV and that the prime contractor to whom TWT had been reporting on Phase III, Northrup Grumman, was being replaced by defendant Raytheon Company ("Raytheon").  Id. at ¶¶ 36-37.

The Navy directed that the Damage Assessment component of the project be subject to open and competitive bidding.  Id. at ¶¶ 48, 57, 178.  Raytheon allegedly represented to TWT that the Damage Assessment component would be, in fact, subject to fair and open competition and that Lockheed would handle the competition as its procurement agent.  Id. at ¶ 39.

Defendants Raytheon and Lockheed launched negotiations with TWT regarding TWT's participation in Phase IV and held several

4

meetings over several months discussing TWT's ideas for the Damage Assessment.  Id. at ¶¶ 39-47, 51-52.  Both Defendants Raytheon and Lockheed entered into confidentiality agreements with TWT covering this time period, in which both expressly agreed to honor the proprietary nature of the information being imparted by TWT and to refrain from using such information for their own purposes.  Id. at ¶¶ 23, 35, 42-43. As a result of these promises, TWT shared with Defendants Raytheon and Lockheed many of its valuable trade secrets, ideas, and other confidential proprietary information.  Id. at ¶¶ 40-43, 45-46.

In reliance on representations, Plaintiff TWT invested large amounts of time and money so that it could meet its obligations if it was awarded the Phase IV work, "including the hiring of additional personnel, the acquisition/lease and fitting out of new/expanded work space and facilities, and the purchase of mandated equipment and software."  TWT alleges it incurred hundreds of thousands of dollars in costs.  Id. at ¶ 53.

TWT alleges that, contrary to the Defendants' representations to TWT, there never was any "fair and open competition" for Phase IV Damage Assessment work.  Id. at ¶ 55. Instead, Defendants Raytheon and Lockheed conspired to take TWT's valuable information for themselves.  They then used this information to get work from the Navy that they otherwise would not have been able to get because they had lacked the expertise

5

TWT had.

Specifically, TWT alleges that even though the Navy directed Raytheon to make the DA component of the contract subject to open and competitive bidding, Raytheon, "[s]o as to lessen the risk of a bid protest from Lockheed," awarded the DA component (and another unrelated portion, the ECS) to Lockheed, "informing Lockheed of the Navy's directive that the work was to be competitively bid."  Id. at ¶ 180.  Defendant Lockheed, in turn, "[s]o as to lessen the risk of scrutiny from the Navy ... bid the Phase IV Engineering Control System ("ECS") portion [only]."  Id. at ¶ 181. Both Defendants, having allegedly and unlawfully misappropriated TWT's trade secrets, confidential and proprietary information, were able to represent their expertise in DA software to the Navy and justify Lockheed's retention of the DA software component without competitive bidding.  Id. at ¶¶ 186-187.

TWT alleges that the Defendants' conduct has resulted in them not being able to compete for the Damage Assessment.  Id. at ¶¶ 69, 71, 199.  TWT's inability to compete on the DDG-1000 project has essentially put it out of business.  Id. at ¶ 199. TWT further alleges that it will be at a severe disadvantage in competing in the future because the Defendants have "falsely bolster[ed] their reputation for technical competence and proficiency through use of TWT's trade secrets..."  Id. at ¶ 196.

6

Moreover, TWT alleges that the Defendants' conduct has allowed them to exclude all competitors from competing for the Damage Assessment work because they have convinced the Navy that they possess the proper technical expertise for such work when, in fact, they only possess such expertise because they stole it from TWT.  Id. at ¶¶ 194-197.

**APPLICABLE STANDARD**

A Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief may be granted must be denied if the plaintiff's factual allegations are "enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true, (even if doubtful in fact)."  Bell Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965, (2007)(internal citations omitted).  Moreover,

> [w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, ... a plaintiff's obligation to provide the "grounds" of his "entitle[ment] to relief" requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.

Id. at 1965 (internal citations omitted).

A district court must accept any and all reasonable inferences derived from those facts.  Unger v. Nat'l Residents Matching Program, 928 F.2d 1392, 1394-95 (3d Cir. 1991); Glenside West Corp. v. Exxon Co., U.S.A., 761 F. Supp. 1100, 1107 (D.N.J. 1991); Gutman v. Howard Sav. Bank, 748 F. Supp. 254, 260 (D.N.J.

7

1990). Further, the court must view all allegations in the complaint in the light most favorable to the plaintiff. See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683, 40 L. Ed. 2d 90 (1974); Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1261 (3d Cir. 1994).

Therefore, in deciding a motion to dismiss, a court should look to the face of the complaint and decide whether, taking all of the allegations of fact as true and construing them in a light most favorable to the nonmovant, plaintiff has alleged "enough facts to state a claim for relief that is plausible on its face." Twombly, 127 S. Ct. at 1974. Only the allegations in the complaint, matters of public record, orders, and exhibits attached to the complaint matter, are taken into consideration. Chester County Intermediate Unit v. Pennsylvania Blue Shield, 896 F.2d 808, 812 (3d Cir. 1990).

**DISCUSSION**

**A.  Count XVI**

Defendants have moved to dismiss Count XVI (the Sherman Act antitrust conspiracy count) on the grounds that TWT fails to state a claim. Specifically, Defendants contend that: (1) TWT's conspiracy theory makes no economic sense; (2) TWT fails to adequately allege a conspiracy; and (3) TWT has no antitrust standing because it fails to allege harm to competition.

8

Section 1 of the Sherman Act, 15 U.S.C. § 1, provides:

> [e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states...is declared to be illegal.

15 U.S.C. § 1. The parties are in agreement that in order to state a claim under section 1, a party must allege: (1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the concerted action was illegal; and (4) that the plaintiff was injured as a proximate result of the concerted action. Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997).

The Court turns first to the Defendants' contention that TWT has failed to plead a conspiracy sufficiently. To prove the existence of a conspiracy, there must be a "'unity of purpose or a common design and understanding or a meeting of minds"' or "'a conscious commitment to a common scheme.'" Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752, 764 (1984) (quoting Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 111 (3d Cir. 1980)). In a section 1 claim, the complaint must have "enough factual matter (taken as true) to suggest that an agreement was made." Twombly, 127 S. Ct. At 1965. There must be enough facts "to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." Id.

The complaint need not allege that the parties to an

9

agreement had identical motives. Spectators' Community Network v. Colonial Country Club, 253 F.3d 215, 220 (5th Cir. 2001) ("Antitrust law has never required identical motives among conspirators and even reluctant participants have been held liable for conspiracy"). As long as the complaint alleges that the alleged co-conspirators had a plausible reason to participate in the conspiracy, the complaint is sufficient. Rochez Brothers v. North American Salt Co., F. Supp 2.d (W.D.Pa. 1994). It is also sufficient if the complaint alleges that the defendant, regardless of its own motive, merely acquiesced in an agreement knowing that it would have anti-competitive effects. United States v. Paramount Pictures, 334 U.S. 131, 161 (1948); Virginia Vermiculite, Ltd. V. W. R. Grace & Co., 156 F.3d 535, 541 (4th Cir. 1998).

  The Court disagrees with the Defendants' argument that the Complaint, with all reasonable inferences drawn in favor of TWT, fails to adequately allege that Raytheon and Lockheed conspired with each other. TWT alleges in detail how Lockheed and Raytheon worked together to prevent TWT to bid on the Phase IV work. In paragraphs 39 and 60, for example, TWT alleges various facts to support its allegation that Raytheon and Lockheed conspired to foreclose TWT from bidding on the Damage Assessment component of the Phase IV project. At paragraph 39 of the Complaint, TWT alleges that "Raytheon assured TWT that it would closely monitor

Lockheed [Raytheon's procurement agent] to assure fair and open competition." Compl. at ¶ 39. TWT alleges that it provided proprietary, confidential and trade secret materials to both Raytheon and Lockheed, both of which assured TWT that the Damage Assessment component was being competitively bid. Despite these assurances, TWT alleges, Raytheon awarded the Damage Assessment, as well as the ECS, components of the contract to Lockheed without subjecting them to competitive bidding. Defendants acted together "in furtherance of their plan to restrain competition and increase their profits." Id. at ¶ 48. As further part of their plan to restrain competition, TWT alleges that the Defendants, motivated to avoid bid protests, engaged in a "joint and cooperative effort to misuse TWT confidential, proprietary and trade secret information." Id. at ¶ 68. The Defendants allegedly used this information to their financial benefit, and the detriment of TWT.

Because conspiracies are often proven by circumstantial evidence, the Complaint has sufficient facts (taken as true) to suggest that an illegal agreement was made between Raytheon and Lockheed. There are clearly enough facts to raise a reasonable expectation that discovery will reveal an illegal agreement. Accordingly, TWT sufficiently alleges a conspiracy. Cf. Twombly, 127 S. Ct. at 1971.

Defendants also argue that the conspiracy TWT alleges makes

11

no economic sense and should be dismissed under the rationale of Matsushita Elec. Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574 (1986).  In Matsushita, the Court found that economic plausibility was a factor to consider in the summary judgment context, particularly in light of the high cost of litigation.  Id. at 596 ("the absence of any plausible motive to engage in the conduct charged is highly relevant to whether a 'genuine issue for trial' exists").  This case, however, is not at the summary judgment stage.  Moreover, even if this Court were to follow the few courts that have applied the Matsushita reasoning at the motion to dismiss stage, the Complaint alleges sufficient facts to suggest that the conspiracy makes economic sense, particularly in the long-run.  See Compl. at ¶¶ 179, 180, 182, 184, 196.

The Court next turns to Defendants' argument that TWT has failed to plead an antitrust injury, to wit, concerted action that produced anti-competitive effects within the relevant market.  The Supreme Court has held that notwithstanding the plain language of the statute, the Sherman Act's prohibition of "every" agreement in "restraint of trade" prohibits only agreements that unreasonably restrain trade.  Standard Oil Co. Of New Jersey v. United States, 221 U.S. 1, 59-62 (1911).  An agreement that restrains or harms a competitor does not fall within the Sherman Act's prohibition.  The unlawful agreement must harm competition.  Spectrum Sports v. McQuillan, 506 U.S.

447, 458 (1993); Atlantic Richfield Co. V. USA Petroleum Co., 495 U.S. 328, 338 (1990).  Thus, an allegation that a company was harmed "does not automatically show injury to competition." Nynex Corp. V. Discon, Inc., 525 U.S. 128, 139 (1998); see also Indeck Energy Service v. Consumers Energy Co., 250 F.3d 972, 977 (6th Cir. 2001) (district court properly dismissed claim where alleged harm suffered by plaintiffs "was in the company's capacity as a competitor in the marketplace, not as a defender of marketplace confusion"); McGlinchy v. Shell Chemical Co., 845 F.2d 802, 812 (9th Cir. 1988) ("elimination of a single competitor, without more, does not prove anticompetitive effect").

TWT argues that it does allege injury to competition at paragraph 188 of its Second Amended Complaint.  Specifically, TWT's Second Amended Complaint alleges that the Defendants' conduct has had the "anticompetitive effects of excluding competition, artificially increasing prices, decreasing the quality of products and/or reducing innovation in the relevant markets."  Compl. at ¶ 188.  These allegations, however, are really nothing more than the ill-fated "labels and conclusions" buried by the Supreme Court in Twombly.  Twombly, 127 S. Ct. at 1964-65 ("a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a

13

cause of action will not do")(internal citations omitted). Under Twombly, a plaintiff must do more than make general, conclusory allegations.

While TWT has clearly pled sufficient facts to show injury to itself, there is nothing in the Complaint to plausibly support injury to the competition, other than conclusory allegations. For example, the Complaint does not describe the marketplace, other than itself, or even suggest the presence of other actual competitors. Indeed, TWT characterizes itself as "unique." See Compl. ¶¶s 14-15. Nor does the Complaint sufficiently allege that the restraint has had or is likely to have a substantial anticompetitive effect. This failure is fatal to the Complaint because restraints that produce insignificant, de minimis, or insubstantial restrictions of competition are not unlawful. United States v. Topco Associates, 405 U.S. 596, 606 (1972); Tunis Brothers Co. V. Ford Motor Co., 952 F.2d 715, 728 (3d Cir. 1991). There simply are not enough facts to plausibly support injury to competition. A bare allegation will not suffice. Otherwise, if alleging injury to a competitor were enough to infer or imply injury to competition, then pleading a section 1 violation "would be a sure thing." Cf. Twombly, 127 St. Ct. at 1971 ("if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure

14

thing").

In so holding, this Court is not applying a "heightened" pleading standard under Federal rule of Civil Procedure 9, as Defendants urge. Rather, this Court finds that because TWT has only conclusorily alleged injury to competition, it has failed to state a claim for relief that is plausible on its face.

In addition, the Court will not grant Plaintiff's informal request to amend the Complaint because Plaintiff has failed to properly request leave to amend the Complaint:

> to request leave to amend a complaint, the plaintiff must submit a draft amended complaint to the court so that it can determine whether amendment would be futile. Indeed, we have held that a failure to submit a draft amended complaint is fatal to a request for leave to amend.

Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc., 482 F.3d 247, 252 (3d Cir. 2007); see also Ranke v. Sanofi-Synthelabo Inc., 436 F.3d 197, 206 (3d Cir. 2006)(finding that court did not abuse its discretion in not granting request for leave to amend presented as part of opposition brief because such leave was not properly requested). This Court will, however, consider a properly filed motion.[2]

For the above reasons, Count XVI of the Second Complaint is dismissed.

---

[2] Pursuant to Local Rule 7.1(f), Plaintiff must attach a copy of the proposed amended pleading to its motion.

15

**B.   Count XII**

Defendants Raytheon and Lockheed argue that Plaintiff TWT has failed to allege novelty, an essential element of a claim for misappropriation.  In order to state a claim for misappropriation, a plaintiff must allege that (1) the idea was novel; (2) it was made in confidence to the defendant; (3) it was adopted and made use of by the defendant in connection with his own activities.  Baer v. Chase, 392 F.3d 609, 627 (3d Cir. 2004) (citing Flemming v. Ronson Corp., 107 N.J. Super, 311 (Law Div. 1969).

The Court finds that TWT has pled each of these elements.  The fact that the Complaint does not employ the term "novel" is not fatal to the Count.  TWT clearly alleges that its approach to damage control is "unique."  Compl. at ¶¶ 14-15.  TWT further sets forth in the Complaint that it has developed "'unique' and proprietary methods and systems for controlling...shipboard damage." Id. at ¶ 5.

The complaint also alleges that "TWT agreed to communicate these ideas in confidence to defendants Raytheon and Lockheed with an expectation that Raytheon and/or Lockheed would compensate TWT in the event they found the ideas useful and wished to actually used them." Id. at ¶ 150 (emphasis added).

Finally, TWT's Complaint alleges in detail that TWT made certain of its ideas available to fellow participants in the DDG-

1000 program only with the assurance that use of the information would be restricted. Id. at ¶¶ 27-34.

Accordingly, TWT has sufficiently pled a claim of misappropriation of idea. Defendants' motion is denied as to this claim.

**C.     COUNT XIV**

Defendants' motion to dismiss Count XIV - Misappropriation of Confidential and Proprietary Information - is also denied. Defendants argue that TWT has failed to plead the existence of a confidential relationship between it and Defendant Raytheon and/or Defendant Lockheed. Although a confidential relationship is not presumed in the business context, TWT has clearly pled and detailed such relationship. TWT alleges that it entered into a Proprietary Information Nondisclosure Agreement with Defendant Raytheon, id. at ¶ 23, and with Defendant Lockheed. Id. at ¶¶ 42, 45; see supra. Accordingly, Defendants' motion as to this claim is denied.

**D.     COUNT XV**

Defendants Raytheon and Lockheed also argue that TWT has failed to state a claim for promissory estoppel. The Court disagrees.

In order to state a claim for promissory estoppel, the

plaintiff must allege:

    (1) a clear and definite promise by the promisor;
    (2) the promise must be made with the expectation that the promisee will rely thereon;
    (3) the promisee must in fact reasonably rely on the promise; and
    (4) detriment of a definite and substantial nature must be incurred in reliance on the promise.

<u>In re Tri-State Armored Services, Inc. v. Thomas J. Subranni, Esq.</u>, 2007 U.S. Dist. LEXIS 29794 at *41 (D.N.J. April 23, 2007).

The Complaint clearly alleges that the Defendants promised and reassured TWT that there would be open and competitive bidding of the Damage Assessment component of the contract. In reliance on their promises, which TWT alleges were false, TWT alleges that it invested large amounts of time and money to support its anticipated work on the Phase IV portion of the project. Accordingly, Defendants' motion is denied as to this claim.

**CONCLUSION**

For the above reasons, Defendants Raytheon's and Lockheed's motion to dismiss is granted as to Count XVI and denied as to Counts XII, XIV, and XV. An accompanying Order shall issue.

Dated: November 1, 2007                s/Renée Marie Bumb
                                                     Renée Marie Bumb
                                                     United States District Judge